Thank you, your honors. May it please the court. My name is Roger David Heiser and I represent five children who we allege were unlawfully restrained in an illegal four-by-four foot isolation room. I'd like to resume or reserve three minutes for rebuttal. In this case, after a three-week trial, a jury found for the defendants as to our contention that it was both negligent and unconstitutional to have locked these five children in this isolation room. Because the verdict form was a general one, we don't know exactly what the basis of the jury's determination was. They could have determined that they didn't believe the children when they testified, that they were placed into the box, or they could have believed the children that they were placed into this unconstitutional to do so. We know that with respect to R.W., the jury must have concluded that it was both reasonable and constitutional to place him in this box because the school district admitted to putting him in the box. While we have taken appeal on 12 separate rulings of the district judge, I'm going to focus my remarks this morning primarily on issues 1 and 2. I will touch on issue 11. Those three issues are the issues that we believe, individually and together, warrant vacating the judgment below and remanding this case for a new trial. I'd also like to just speak briefly also on the issue of the taxation of costs as well. Here, the district judge abused his discretion when he failed to engage in a proper legal analysis to determine if any evidentiary sanction was warranted for the school district's destruction of the isolation box. The prejudicial impact of this error was magnified when the district judge abused his discretion and suppressed the relevant and disinterested testimony of two juvenile non-party witnesses, PK and JB. A brief but powerful chronology is illustrative because it was only five days after the public learned about the use of this box that the school district knowingly and intentionally destroyed the box and sent it to the plaintiff. After they consulted with an attorney? After they consulted with an attorney, yes. And so I'm going to run through that chronology, unless the Court has other questions at this point, but because it was on November 26 that the citizens first learned, the citizens of Longview first learned of the use of this isolation room, and there was a public furor that erupted over it. The practice of using this four-by-four-foot isolation room was immediately stopped. The next day, the 27th of November, a letter went out to all Mint Valley Elementary School parents, authored by one of the defendants, Patrick Kelly, who was the principal of the school, who were special education children, who had the benefit of IEPs, individual education plans, aversive intervention plans, parental permission, in other words, who had gone through all the precautionary requirements for the use of this isolation room, were being placed into the room. Significantly, Mr. Kelly, when he sent out that letter, knew that to be false because he knew that RW had, in fact, been put into that room back at the end of October of 2012, almost a month before the public furor erupted over its use. Significantly, in this chronology, the records that were made contemporaneously with the use of the isolation room for RW were either altered or purposely misrepresented. The fact that RW was never placed into that seclusion room, and that can be found on the record at ER-164. There's a document that affirmatively states that RW was never placed into that isolation room. On the 28th of November, Sandra Catt, who was speaking for the school district, informed the media that they had learned that the isolation room had been used for at least one general education student, which she indicated would be a clear violation of code. And that admission was made on the 29th of November. At the time that the isolation room was being used, the Washington Administrative Code, the sections that are found within the sections governing special education children, outlined very specific both physical and operational criteria to make the use of that room lawful. On November 30th of 2012, the superintendent of the school district, who was also a defendant, Susan Cusick, wrote a memo to the school board indicating that they were going to be investigating whether or not the use of the booth was proper. She let the school board know that she did not know that an isolation booth even existed in the district, and also that it appeared as though the isolation room met some but not all, and I'm quoting from her memo, met some but not all of the codes, such as a window or ability to view the child. She did indicate in that memo that removing the booth. On November, at this point, the testimony of Christopher Fritsch, the assistant superintendent of the school district, is particularly probative because he testified that as of November 27th, he was concerned about the potential liability flowing from the use of this booth, that he was tasked with investigating its use, whether or not the booth itself was Who was that? Christopher Fritsch. Okay, thank you. Whether or not the booth itself was legal, as both physically configured and as used, and whether or not the criteria for the safe use of the isolation booth was being followed as prescribed by the Washington Administrative Codes. Even though they knew this, and Judge Deck, this gets to your point, even though they knew this as early as the 27th, they understood this potential liability as early as the 27th of November. By the 29th of November, in consultation with the school district's attorneys, they made the decision to destroy and get rid of this isolation booth. There was no instruction given to carefully document or photograph the booth. There was no instruction to take the booth to Were there any photographs at all? There were photographs that were posted on Facebook. An angry parent Something good about Facebook. An angry parent. So the way this public furor erupted was that there was this pattern in practice of sending general education children to the Children's Learning Center. And on one occasion when, which is at the heart of one of our 1983 issues, but one of the general education students that was sent to the CLC under this practice went home and told his parents what had happened. And the father stormed back into the school and stormed in and took photographs. And those are the photographs that found their way onto Facebook. And those are the only photographs. In fact, the part of the record that we've cited to this court has one of those photographs that was taken. I was unclear about the use of the booth, which obviously is at the core of your complaint. But was it for special ed students or general students? The elementary school was for both, right? The elementary school was for both. The booth itself was, the testimony was that it was used solely for special education students who had individual education plans and aversive intervention plans. And that those, the requirements for those are carefully spelled out in the code, the Washington Administrative Code dealing with special education children. And this also gets to the issue with to the court that while the regulations as to special education don't apply to general education students, they certainly establish the standard of care for the safe use of the isolation booth. Also of significance, there is nowhere in either Washington statutes or regulations that specifically authorized the use of an isolation room like this for general education students. It was only for special education students who went through the rigorous criteria of the Administrative Code. So the CLC, to finish answering... The Children's Learning Center. The Children's Learning Center. Which you think may be a misnomer. Well, you know, I'm not here to debate whether or not that the Children's Learning Center or the concept of the Children's Learning Center itself was not a good one. I think that there was ample testimony from Kathy Souders, for example, who started that program, that it was a good program. It just had to be a person to make it a good program and a productive program for these children who had serious behavioral... were facing serious behavioral challenges because of mental disabilities that they had. Was the Children's Learning Center all one big room? It's just one room. It was one room... And for all the children containing this isolation booth? It was one room solely for children... solely for special education children who were diagnosed with severe behavioral issues. Oh, wait a minute. But general education children went to the... Went to the same elementary school. CLC. But they didn't go to the CLC. Well, some of them did because they witnessed the... Yes. So that was done. The only way a general education child ever found his or her way into the CLC was by virtue of this policy, which was immediately stopped after the school district's investigation said you can't do this. It was... if they were a discipline issue, there was a policy that the discipline issue would go from the general education classroom to the principal, Patrick Kelly. And if he wasn't available, it would go to Jerry Stein, the head, the teacher who was responsible for the CLC. What happened... What would happen... Are you going to tell us about Mr. Stein later? I will answer whatever questions you have about Mr. Stein. I don't want to... I only have a certain amount of time, but what would happen is that Mr. Stein would then routinely take these general education students who presented a disciplinary problem in their general education classroom to his CLC, where he would discipline them. And in the instance of the five children that I represent, he disciplined them by placing them and locking them into the isolation booth, which was, we contend, was unlawful and unconstitutional. So there... So as I say, that there... By December 2nd, so we're five days, with five full days after this event, before the investigation is complete, legal jeopardy is clearly known, at least to the assistant superintendent of the school district, Mr. Christopher Fritch, that the isolation box is dismantled and taken to the... taken to the landfill, and there's a really quite prophetic email that I think you've seen. I think it's ER 241 that says, you know, the booth is gone. Long live the booth. It's in the landfill. As I say, the investigation, the school district assured the public that they were investigating whether or not the booth was being used properly. At the time the booth was destroyed, the investigation into that was not complete. It's clear from the record that that investigation was not, at least the preliminary conclusions, were not complete until the 19th of December, so two weeks after the booth had been destroyed. And interestingly, in that document, this is at ER 205, or 245 I should say, the investigators that were hired, and this was a law firm that was hired by the school district to investigate, couldn't really opine. They tried to sort of finesse the issue of whether or not the booth was legal, but they couldn't, they had to, they had to tell because it was gone. After destroying the booth, the school district came into court and, as your honors know from reading the record, laid down the gauntlet. They made it clear in their opening statement that the booth was legal in all ways, that it could not be locked from the outside and left, you know, with a child locked in there without a teacher being present. They put on lay witnesses, expert witnesses to testify to this, and they really, as I say, lay down the gauntlet. Against this, the plaintiffs presented the testimony of one of the children, WL, who testified that he had in fact witnessed Mr. Stein lock a child in the room, in the room, which is a clear violation of code and evidence that the box was not being used in a legal manner. We also presented the testimony of our expert, Dr. Christopher Jones, who testified that based upon the evidence that he had available to him, it was his opinion that the box did not meet the legal requirements of the Washington Administrative Code, and it was unfortunately against these facts that the district judge failed to make an analysis, which I think I suggested in my reply brief that really breaks down into three parts. The first, the plaintiffs or the person requesting the spoliation instruction bears the burden of showing that there was an obligation to preserve the evidence, that the evidence was relevant, and that the evidence was destroyed with an awareness of the potential relevancy. And I think the record here was clear on that, even though we don't know how the judge, the judge didn't go into that analysis. And that's the Appleby-Samsung case out of the district court in California, Northern District of California. The second — If you had had the booth available to you, how would you have used it? We would have determined whether or not it was lawful to use, whether or not it could be locked from the outside, as some of the witnesses have said, which would be unlawful, whether or not it was properly ventilated, whether or not it was properly lighted. The codes require that the box be adequately ventilated  But it didn't have a top. This box, and I think it's in the record that we've cited to the court, had a plexiglass — it's kind of an opaque or clear — I'm sorry, clear kind of plexiglass ceiling. I thought it was open. It was not open. It was not open. It had a clear — with holes drilled in it. That was considered  drilled in it. And then ambient light from the classroom would filter through that down into this padded, this pink padded, four-by-four, otherwise dark box. So we would have been able to establish whether or not it met code. And I think that the relevance of that is that clearly, whether or not you're a special education child or a general education child, the isolation confinement or room that you're being placed in should meet code. And if it doesn't, it is unlawful to place a child there. Counsel, it's entirely up to you how you want to use your time, but did you want to save rebuttal time? I had three minutes — I was going to save three minutes for rebuttal that I indicated at the beginning. So — and then the third part of it is that — and this is really where we fall short — that there has to be a sufficient — the penalty or the sanction has to be sufficient to penalize the spoliating party. It has to have a deterrent value to both the spoliating party and to other litigants, future litigants. It has to cure prejudice to the affected party by restoring them to the position they would have been in but for the spoliation. And it has to restore the accuracy of the fact-finding process. And finally, and importantly, it has to place the risk of the erroneous judgment — of an erroneous judgment on the spoliating party. I — here the Court simply cited to his experience as a state court judge and state constitutional sanctions against improper comment on the evidence and said that he wouldn't give the — wouldn't give the proposed instruction based upon that wholly inadequate record. We believe that there was prejudice as a result because the verdict was general. Either the jury believed the children were locked in the box, but that it was — I'm sorry, either the children — or either the jury didn't believe the children were locked in the box or they believed the children were locked in the box, but it was reasonable to do so. Obviously, if it's the first thing — first — if it's A, we — this is all moot. And if it's B, then the defendants must have had a — must have a reasonable basis to restrain the child, and the nature of the restraint has to be reasonable. In other words, the qualities of the room in which they're restrained have to be reasonable. And here we contend that they were not. I see that I'm down to a minute 52. Unless there are other questions, I do want to address the issue of costs. I don't believe that it was — I have more questions. Yeah. I have a question. Okay. I want to hear about Mr. Stein. What was the inappropriate conduct he was accused of doing? I don't care how long ago it was, with a school child. Well, I've articulated it, I think, in quite — in a lot of detail in my briefing. But it is of a both sexual abuse of nature and a physically abusive nature, both witnessed by — some of which was witnessed, I witnessed, by teachers who were present, Ms. Souders in particular, who would have testified directly about what she'd witnessed. And then — What age group of children was he in charge of at that time? Same age group. Same — Elementary school. Same school? It was the same — well, it wasn't the — it was Longview School District. Same school district. So there were instances of sexual abuse — or sexual inappropriate touching that were eyewitnessed. There was instances of physical abuse where he would squeeze the trapezius on children until they, you know, would fall to the ground or flick their ears. I mean, there was just ongoing evidence that he was inappropriately — So that's who they put in charge of the Children's Learning Center for behavioral issues? Yes. That's who they — Of interest. And it's — it is our position that that's why it was inappropriate for the court to suppress that evidence. No matter how long ago it was. I understand your argument. Because — And it goes — and it went right to the point of — If any of that had been true, and I don't know if it was, but it had been witnessed by adults, then the most vulnerable children are the ones who are subject to that kind of behavior. That's correct, Your Honor. And we think that it was negligent to place — at a minimum, it was negligent to place it — So I've used all your time, so I'm sure you'll get more time. Unless there are other questions. Thank you very much. Thank you. For your planning purposes, why don't you assume we'll give you three minutes extra time for rebuttal. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, John Safarley for the defendants in this matter. Your Honors, defendants respectfully request that this Court affirm the trial court on all grounds. And by way of introduction, I would submit that plaintiffs are essentially asking appellate relief in the form of second-guessing the trial court's decisions. Judge Bryan presided over a 17-day trial with 41 witnesses and 99 exhibits by our count admitted for either substantive or illustrative purposes. A jury of plaintiffs' peers heard the claims, the evidence related to their claims, and testimony, including testimony that cast serious doubt on plaintiffs' credibility, such as parts of their story. And that's in the supplemental excerpts of record at page 70, lines 2 through 3. After listening to the testimony and evaluating the credibility, the jury found against plaintiffs on all counts. And plaintiffs are essentially asking for a do-over of many of the decisions that Judge Bryan made, not only during trial, but before trial as well. There was a preliminary order on motions and lemonade that Judge Bryan issued. He asked the parties to come down and argue the motions. And then he affirmed his preliminary evidentiary rulings in a final order on the motions and lemonade. There was an extremely thorough and conscientious weighing of the evidence, both before trial and after trial. And we would ask this Court not to disturb those evidentiary rulings, given that Judge Bryan has afforded a broad discretion in almost all of the issues that have been appealed. I would like to, given the amount of issues that have been appealed, narrow my focus to a couple points. First, as was brought up by opposing counsel, he mentioned the verdict form, that it was a general verdict form. And I would only ask this Court to essentially sidestep that issue, because, number one, there was no other verdict form proposed by the plaintiffs. Number two, plaintiffs have not appealed the giving of the verdict form that Judge Bryan handed down to the jury. So I don't think that should play any role in this Court's analysis. I'd like to address the spoliation issue, because I think that what's missing from a plaintiff's presentation was what Judge Bryan did allow them to do. Now, he certainly didn't give them a jury instruction. We're not disputing that. The record speaks for itself. They argued that. And I would like to quote several portions. Supplemental excerpt of record at page 217, lines 9 through 19. And I'm jumping around within this paragraph. When you hear one of your fellow jurors talk about this and express these views, tell them, tell them to wait a minute. What has the school district done to earn your trust? Tell them everything they have done, dot, dot, dot, from 2005 to the date in December 2012, when they destroyed the box and sent it to the landfill. Destroys any sense of trust or confidence we can have in what they say. Supplemental excerpt of the record at page 219. Well, ladies and gentlemen, we have been deprived of the right to challenge that evidence, meaning the isolation booth. You have been deprived of the right to inspect the box by the purposeful and intentional and counseled conduct of the school district to destroy that evidence. That is not right. They should be held accountable for that. This is supplemental excerpt of the record, page 233. You have to ask yourself, why was that booth, box calming booth destroyed? Why? You get to use your common sense, thankfully. Now, it's difficult to imagine more forceful language. You put that on the same plane as an instruction from the judge? I think that in terms of the ability to attack the evidence, I do. Because Judge Bryan gave plaintiff's counsel the platform to tell the jury what to do with the evidence. So I would read that quote again. You have to ask yourself, why was that booth, box calming booth destroyed? Why? You get to use your common sense, thankfully. That is essentially a platform for the plaintiff's counsel to tell the jury what. If he had given them the alternative and proposed instruction that they had offered, the end last sentence would have been, you may assume that such evidence would have been unfavorable to the defendant. Well, I think that that last part that you just quoted, Your Honor, was communicated in those earlier paragraphs that I quoted from. These were long colloquies during closing argument. I pulled out some parts, but there is a clear message that's being delivered. Did the school district at any point have any duty, before they destroyed it, any duty to preserve the box? Well, I think the record speaks for itself in terms of Mr. Fritch's. Was there any duty to preserve it? We did not dispute that there was an evidentiary preservation duty that attached. I think where I was going with my answer was that Mr. Fritch did testify on the stand that he anticipated there would be liability. Now, he, in the same testimony, also said that his motivation to destroy the booth was done because of the media scrutiny and there was a van parked outside from the news media with lights flashing on the school grounds. So, he acknowledged that they did anticipate litigation, but that didn't motivate. Now, how that plays into the culpability, I think, was something that Judge Bryan certainly took into consideration. He heard the testimony of Mr. Fritch. But again, I think the difference between what plaintiff's counsel was allowed to tell the jury during closing and what would have been an instruction from Judge Bryan is not significant enough to create substantial unfairness. And that's the burden that plaintiffs have to show is that it was substantially unfair for them not to have an instruction from Judge Bryan. And I would refer this Court to two decisions that we cited. First, Mann, which is an unpublished opinion, but it's still instructive. And there, what the Court said was two things. Number one, it did not disturb the trial court's decision that a spoliation instruction would be an unfair comment on the evidence. In other words, in Mann, the trial court used the same reasoning as Judge Bryan  And the second part in Mann was that, and this is a quote, the alternative form of relief, which was allowing plaintiff's counsel to argue during closing, was that, quote, they allowed the plaintiffs to argue that the jury should presume the evidence and the missing records was favorable to plaintiffs. That was the same permission that was given to plaintiff's counsel. Now, I don't, I wouldn't get too hung up on what plaintiff's counsel actually argued in their closing, because if you go back and you read Judge Bryan's instruction to plaintiff's counsel, he said you can argue everything that's in the instruction. Now, I don't know if opposing counsel actually went as far as the instruction would have allowed them to do, because if you go back and you read the instruction, there is a permissive inference that is allowed in the instruction. Judge Bryan said you can argue everything that's in the instruction, including the permissive inference. Whether they actually argued, opposing counsel actually said you can infer that this evidence would be harmful, I think, number one, a careful study of the closing argument record would show that that message was effectively delivered. But number two, Judge Bryan gave them the permission to do that, and whether they actually carried that out was not an error by Judge Bryan. It was an advocacy decision by plaintiff's counsel. Photographs admitted into evidence? They were, and I actually, in response to your question, Your Honor, they are at the supplemental excerpt of record, page 589 and 590 to 92, and they were displayed in front of the jury the entire trial in a large whiteboard fashion, or poster board, I'm sorry. I'd like to also point out, we cited another case, United States versus Wise, which is from the Fifth Circuit, that held that the fact that the court did not give an instruction does not mean that appellants were denied the opportunity to present their spoliation claim. So again, were plaintiffs substantially impaired in presenting their spoliation claim? And I think the answer has to be no, given the standard that Judge Bryan's decision is being rendered under. Furthermore, I think that plaintiffs, in a sense, are having it both ways. They want to argue that the Booth was critical to their case, but they also presented during trial testimony and argument that it doesn't matter whether the Booth met code or not. It's never okay to put a general education student in the Booth. And I'll quote from plaintiff's closing argument. This is in the transcript on December 28, 2017, at page 48. Quote, RW should never have been placed in the box. And there are other quotes, especially from Judge Jones, I'm sorry, Dr. Jones, who testified on December 12, extensively that it was never permissible for a general education student to be placed in the Booth, regardless of whether it met code. That was their theory of the case at trial. And it doesn't excuse the culpability, but what it shows is that the actual physical Booth itself had reduced relevance, given their theory of the case. I'd like to move on to the jury instruction issue, which is issue number 11, and expand on this a bit more, because I think it is important. I want to start with the standard of review, if I could. Counsel, if I could interject, let me ask you a question about your last point you made. If they had alternative arguments, you know, one was that it's a terrible Booth, and we can't prove that, and the other was that it's a, in any event, general education students should not be permitted in it. I don't quite see how the alternative argument would answer the spoliation issue. Well, it's not dispositive to the spoliation issue. My only point with that particular issue was that they had presented various theories to the jury, one of which was it doesn't matter to what extent the Booth met code or not, it was unlawful to place general education students in the Booth. I think there were some arguments and some testimony presented that did go to whether the Booth met code, and I think they tried to sort of branch out their claims a bit and present different grounds for the jury to find liability for the defendants. So to your Honor's question, I think the record does show they did present alternative arguments. My only point regarding the spoliation issue is that I think, in a sense, the fact that they presented one theory that said under no circumstances should general education students be placed in the Booth, I think that mitigates to a certain extent, not completely. It doesn't resolve the issue, which I think was your Honor's question. It doesn't resolve the issue, but it at least mitigates and shows that, and again, looking at the totality of the trial record, given what the plaintiffs were allowed to argue, that Judge Bryan said, feel free to argue everything that's in the instruction. You have that, which is an effective form of alternative relief, regardless of what the theory of the case was. There's that piece, and then the other piece of it is that they did have various theories of the case as well. Turning to the jury instruction issue, I think the standard of review for issue number 11 is critical, and I'd like to quote from Reed versus Hoy, which is that, this court reviews jury instructions to determine whether, taken as a whole, they mislead the jury or state the law incorrectly to the prejudice of the objecting party. So long as they do not, we review the formulation of the instructions and the choice of language for abuse of discretion. So the first step requires the jury instructions to be viewed in totality. Not only that, but as this court said in United States versus Maribelis, jury instructions have to be viewed in the context of the whole trial. So there's an initial step to determine what the standard of review is, and that requires looking at the jury instructions in the context of the entire trial. In doing so, we see, first of all, that instruction number 18, which quotes from a special education WAC, is an accurate quotation of the law. Nobody disputes that instruction number 18 somehow misstated the WAC. The, but... Washington Administrative Court? Washington, pardon me, Your Honor, yes. Thank you. Oh, I apologize. Speaking in code stresses me. Well, I'm trying to condense my presentation as much as I can. I'd like to look at instruction number 19 very carefully, however, because I think plaintiff's argument is that instruction number 18 and number 19, taken together, are confusing, but I would dispute that. If we read, if we look at 16, 17, and 18, 16 is a statute, 17 is a provision from the Administrative Code, 18 is a provision from the Administrative Code. Now, I'm going to read instruction number 19 out loud. The foregoing Washington state statute, that's number 16, and Washington Administrative Code, number 17, apply to the general education students. The Washington Administrative Code, which is instruction number 18, provisions that apply to special education students, individual education plans, and aversion plans, do not apply to general education students. Now, plaintiffs have argued that that's confusing, but I would counter that it's actually a very well-crafted instruction because number 19 tracks 16, 17, and 18 in sequence. Furthermore, if we look at instruction number 19, when Judge Bryan was telling the jury which regulations and instructions do not apply to the general education students who are the plaintiffs, he used the phrase aversion plans. In other words, in the instruction, it says the Washington State Administrative Code provisions that apply to dot, dot, dot aversion plans do not apply to general education students. So the word aversion plan or phrase aversion plans is in instruction number 19. Now, go back to number 18. Number 18 has the term aversive interventions in it. So you have a clear nexus between which instruction number 19 is telling the jury to apply to the general education plaintiffs and which instruction Judge Bryan is telling the jury does not apply to the general education plaintiffs. And I think that's important because you have also plaintiff's counsel in his closing argument stating, and this is from supplemental excerpt of record 227, quote, and the judge has instructed you that the provisions of the Washington Administrative Code that deals solely with special education children don't apply to general education children. So plaintiff's counsel was reminding the jury about number 19 and how it divides out 16 and 17, which apply, excuse me, apply to the plaintiffs and 18, which doesn't. I think that's important because plaintiffs have argued that those instructions taken together are confusing, but I would argue taken together and taken in the context of the trial, Judge Bryan carefully crafted number 19 to number one, flag number 18 by saying the instruction that deals with aversive plans does not apply. And if you look to number 18, it has the phrase aversive interventions in the instruction, and he also sequences it correctly to say 16 and 17 apply, 18 does not apply. So I think at the end of all that, we go back to Reed versus Hoy and look at the standard. Do the instructions taken as a whole mislead the jury? No. Do they state the law incorrectly?  And finally, I would like to just address Judge Jack's line of questioning about Mr. Stein. I understand the appearance of that evidence, but I would say there are there's a procedural and a substantive safeguard that was in place. The procedural safeguard was the I had never been involved in a trial where a judge issues a preliminary order on motions in lemonade, then brings the parties down and then issues a subsequent final order. That I think, given the nature of the evidence, Judge Bryan, likely, of course, I can't speak for him, took that additional precaution to say, I want to hear absolutely everything there is to hear about this body of evidence that's being presented. He gave the parties, I think, close to an hour and a half to two hours to argue motions in lemonade after he had already examined the evidence. Second of all, I would direct this court. He found it to be untrue. He found it to be too remote. Well, I would push back on that a little bit, because I think the line that or the phrase that Judge Bryan used was that the evidence was. Either remote in time occurred after the events complained of in this case and or has been recanted. And so there were multiple different reasons. He looked at each individual incident and took a deep dive. And I think the record will reflect, especially because the transcript from that motion in lemonade hearing is in the record. And so are the party's briefs on the motions in lemonade and all the attachments. It's all in the record. There were investigations by the Longview Police Department. There were no what evidence he found was too remote. I think that going through the transcript from the motion in lemonade hearing. The parties presented various arguments, so I can recall off the top of my head, there was an allegation made against Mr. Stein that was more recent 2007 that was recanted by the family. After being interviewed by law enforcement. So I think that particular incident speaks for itself, that that would not be remote in time. I mean, that's from the 2000s, but it fell under the recanted prong that Judge Bryan threw out there as a reason to to not disregard the evidence, but just to carefully weigh the probative value against the prejudicial value. And just on the last point, with my time wrapping up here, Your Honors, the standard that has been articulated by this court for these evidentiary rulings is if there is a conscientious weighing of the evidence. And I think that Judge Bryan's approach to the evidence, the reasoning that he adopted reflects a conscientious weighing of the evidence, even if judges would perhaps disagree with his rulings. I don't think anybody can dispute the conscientious approach that he took. And that, I believe, satisfies the abusive discretion. May I just ask one question? Yes, I was going to say you should definitely finish your argument. Yeah, because we gave three minutes extra to it. I would just like to ask you one question on a whole different topic. Is it the district's plan to to collect on the costs that were awarded? The $25,000. I went back and looked at the and I went back and looked at the motion to retax costs and. You know, there wasn't I observed that there was not a declaration from the parents, whatnot, but some of the kids that are saddled with these costs are on Social Security and one of the parents is on disability. I mean, you know, Judge Bryan could have reduced the amount of costs. I think given Judge Bryan's order, essentially that there is no discretion to reduce costs, but the briefing before this court, I think, shows a little differently. I. Are you abandoning your. No, I don't have the sort of clout to do that. I would say that that's certainly. I think if I could answer this bench's question by saying that's given everything that's happened, I think that's probably the least important. Issue, I think, preserving the district court's evidentiary rulings, the jury's credibility weighing process and the outcome of the trial is more important than the cost. I can't say one way or the other whether we're abandoning, but I think that would probably be an option that would be on the table. You don't really need to abandon it. It's probably going to get knocked out by the panel. Well, after reviewing the case law, to be totally candid with the panel, after reviewing the case law on what this court has said about discretion, when costs can be taxed or reduced, it does appear to be in conflict with the order that came down from the court. I think Judge Bryan got everything else right. But there is some tension there. So ultimately, it's up to the panel's will as far as what happens with cost. There are civil rights plaintiffs, and the school district probably has an annual budget that's a lot more than these individual plaintiffs. Correct. So I can represent to this panel that I, understanding, I think, how the outcome of that issue is going to play out anyway. I think that the district would certainly be willing to walk away. I think the important part of that was the credibility determinations and the outcome of the trial. If I could have maybe a minute or two more to address the evidence of the students regarding their non-party students that were offered by plaintiffs to testify on the very narrow issue of whether the door could be kept shut without an adult. Why don't you, you're three, almost four minutes over, but take one more minute. I would just say, Your Honor, that I think as far as that ruling goes, again, this is a decision that's vested with the trial court. It's inherently a trial management decision. It's reviewed under the abuse of discretion. Furthermore, this court can affirm it on either any ground supported by the record. So Judge Bryan, I think in his reasoning, said that this evidence has reduced relevance in terms of whether the door can be closed without an adult standing outside of it. He, I think, picked up on one of plaintiff's theories, which was that under any circumstances, putting a general education student in the booth is unlawful. And so I think he said it had a reduced relevance, but it also was cumulative because there was testimony from two of the plaintiffs that the door could function in the way the plaintiffs were alleging. So was it an abuse of discretion not to allow two more non-party witnesses to say the same thing that the plaintiffs said? I would respectfully submit not, especially when plaintiff's counsel reminded the jury in his closing argument at Supplemental Excerpt of Record 234-235, quote, what you heard is you heard testimony from children that teachers walked away. In fact, you heard W.L. state at one point when he went back into the CLC room to get something, he saw the door being held, you know, closed without somebody standing in front. So there was testimony in the record. It was, the jury was reminded of it in closing. And so this court can affirm the ruling on the fact that it was cumulative, it would have been cumulative, but also had reduced relevance. So I appreciate the honors, your honors flexibility with time on this complex case. Thank you. Thank you very much, counsel. Thank you, Judge Jack. I have a catalog of some of the events if you would like to, if you would like me to go through those in terms of the conduct of. Add one more minute to rebuttal. We give you another minute, but we need to conclude then. Thank you. With respect to counsel's comments, excuse me, about the verdict form, I raised that not because we're taking issue with the verdict form. I raised that simply because it is part of our analysis of the prejudice that we experienced as a result of the failure to appropriately sanction the school district and the failure of the trial court to allow both PK and JB to testify the non-party witnesses about the illegality of how the box was configured. On the issue of whether or not the court allowing plaintiffs to argue in closing argument inferences from the destruction of evidence, it is our position, we've articulated in our briefing, that that is not an appropriate sanction given the egregious conduct of the school district in destroying critical and central evidence to the case. I think Judge Pius, you recognize this in your questioning to counsel for the school district in that the attorney's words in closing argument don't carry the same weight as an instruction as to the law given by the judge. And while there are two parts to the analysis, one part is the sanction has to reduce the prejudice to the non-spoliating party such that the danger of an erroneous decision is really placed on the spoliating party's shoulders, not on the children's shoulders as it was done in this case. But secondly, and just as importantly, and this is the Petrel decision that we cite, it is absolutely imperative that the court fashion a sanction that adequately penalizes the spoliating party given the nature, in this case, what I would submit is pretty egregious conduct on the part of the school district and deters future litigants from engaging in the same conduct. If future litigants were to know that the only sanction that they faced was the ability of opposing counsel to make arguments from the destruction of evidence, that may be a small price to pay and a risk worth taking to get rid of critical evidence. And that would really undermine the effective and orderly administration of justice in our circuit. And I think that the courts recognize that, certainly the Petrel court recognized that. Unlike Mann and Weiss, the cases that defense or the school district relies upon, here the court's failure to give that proposed spoliating, spoliation instruction left the plaintiffs in the untenable and unfair position of pitting the credibility of these learning challenged children against adults, the administrators, the experts on the central issue of safety of the box. And as I said before, this left the children bearing the risk of the erroneous judgment and not the way it should have been. As to the issue of the instruction, issue number 11, I'll just speak briefly to that. And really our position on that is that instruction number 18, taken together with 19, and really I think when you look at the entirety of the instructions that that relate to, it's, as counsel correctly pointed out, 16, 17, and 18. 19 says those foregoing statutes and codes apply. The other ones that we discussed don't apply during the trial. The other ones that we discussed, the ones that talk about individual education plans and aversive intervention plans, importantly, those are the ones that discuss the procedural safeguards that have to be taken into account and have to be applied before a child can be safely placed in isolation, if a child can ever be safely placed in isolation. Counsel, I don't mean to cut you off, but you're over your double extended time, so just wrap up your argument. And I'll answer any questions the court has. I have two questions. Yes. Did you find out if there were any other booths in any other schools in that district? There had been another booth, I think in Mount Solo Elementary School, that was also taken to the landfill at the same time. I think if you look at the excerpt of the record that we cited, there was an indication that two booths were dismantled and taken to the landfill. Was there any discovery on the plans for the booth? Who created them? Who built them? There was substantial discovery on that. It was unsuccessful at turning up any credible evidence that would answer the question of whether or not the booth, as constructed, was legal. Counsel, I guess I have a question for you, too, although I was trying to get this to conclusion. If we conclude that the district court should have given the spoliation instruction and did not do so, although he made other statements in the record that may bear on the issue, is the result, in your view, that the case has to go back for a retrial, if that were the sole error that we found? Yes, Your Honor. Yes, Your Honor, because it affected the outcome of the case. We believe that the jury was deprived of the critical evidence and made its decision erroneously on less than the evidence than they should have had. And the reason they didn't have the evidence they should have had, and therefore the reason they came to this erroneous decision, was a direct result of the intentional and willful conduct of the school district. So they benefited from it, as opposed to being sanctioned for it. I appreciate the argument. Your Honor, over your time, but I have one further question for both of you. I assume that before getting to trial, before Judge Bryant, if they haven't changed the rules in the Western District, you probably had an opportunity to mediate or required mediation of some sort. Yes. Is there any prospect that both parties, at this point, would like to use the Ninth Circuit's mediation facility to attempt mediation? It's never mandatory in our circuit, but if it's something you both wanted to do, you'd have that available. So we may issue an order that lets you consider that, but without any pressure to do it. Okay. Counsel, thank you. And we thank both counsel for their very helpful and vigorous arguments. Whenever I hear counsel arguing from the state of Washington, it makes me almost homesick to be in law practice. It's a great job and it's a great bar. So, thank you. Thank you, Your Honor. Thank you, Ross. Thank you all. Thank you. Thank you both. The court is adjourned. I should say also that the Wilson case is now submitted and the court is adjourned.
judges: Gould, Paez, Jack